IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| SHANNON WILLIAMS,<br><br>           Plaintiff,<br><br>v.<br><br>THE CITY OF NACOGDOCHES, TEXAS,<br>ITS FORMER POLICE OFFICER JOSH<br>ANDERSON, and THE OVERLOOK AT<br>NACOGDOCHES, APARTMENT<br>COMPLEX<br><br>           Defendants. | No. 9:21-CV-00071-MJT-ZJH |

## **REPORT AND RECOMMENDATION GRANTING DEFENDANT THE CITY OF NACOGDOCHES'S MOTION TO DISMISS**

This case is assigned to the Honorable Michael J. Truncale, United States District Judge, and is referred to the undersigned United States Magistrate Judge for all pretrial matters.  Doc. No. 102.  On April 9, 2021, Plaintiff Shannon Williams, then through counsel, filed this lawsuit against Defendants the City of Nacogdoches, Texas ("the City"), Nacogdoches police officer Josh Anders, and Cardinal Street Housing, L.P. a/k/a "The Overlook at Nacogdoches" ("Overlook Apartments") (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, for the alleged unlawful assault, detention, and arrest of Williams in violation of her Fourth and Fourteenth Amendment rights. Pending is the City's *Fourth Motion to Dismiss* ("Motion") (Doc. No. 100) for failure to state a claim under Rule 12(b)(6).  As of October 25, 2022, Plaintiff Williams has indicated she will proceed as a *pro se* litigant.  Doc. No. 99.

Because Williams has not adequately alleged the City has an official or customary policy of permitting its officers to commit unconstitutional searches and seizures of its citizens, she has not sufficiently stated a claim for *Monell* liability against the City.  Accordingly, the undersigned

recommends granting with prejudice the City of Nacogdoches's *Fourth Motion to Dismiss*. Doc. No. 100.

## I.    Factual and Procedural History

On April 10, 2019, Shannon Williams, an African-American college student attending Stephen F. Austin State University in Nacogdoches, Texas, was at a sorority gathering at a swimming pool on campus. Doc. No. 44 at 7, ¶¶ 28–29. At around 9:00 p.m., Williams and her friends, who were also African-American, left campus to visit another friend's apartment at the Overlook Apartments, situated just outside campus. *Id.*, ¶ 29.

After they parked their car, Williams and her friends, "and others, were walking along the parking lot, happily talking to each other," when Williams "noticed a white man ahead of them yelling angrily at the group in the parking lot, demanding to know why they were there." *Id.*, ¶ 30. This man, later identified as John Anders, an off-duty police officer for the City of Nacogdoches Police Department ("NPD"), was moving into his apartment at the Overlook Apartments, dressed in civilian clothing, and "having some sort of a tantrum." *Id.* at 1, 7, ¶¶ 1, 30.

In response to Anders's allegedly "erratic behavior," Williams "felt safer going back to the car," and encouraged her friends to do the same. *Id.* at 8, ¶ 30. However, before they could decide what to do next, a "fully lit police car pulled up out of the dark," and an unidentified individual, later identified as Anders, yelled to "stay." *Id.* at 8, ¶ 32. The group of friends could not discern "what was being yelled at whom." *Id.* Williams and her friends therefore continued walking toward their vehicle when Anders exited his police vehicle, ran up behind Williams, and proceeded to "yank[] her around." *Id.* at 11, ¶ 35. "Pandemonium" ensued thereafter. *Id.*

Anders proceeded to pull Williams "up by her shirt," placed Williams in a headlock, pulling her across the parking lot, while bystanders recorded the incident and attempted to break

2

Williams free from Anders's grasp. *Id.* at 11–14, ¶¶ 35–38. After about one minute of pulling Williams across the parking lot, Anders "pushed her down on the pavement, with her face and head on a concrete curb," twisted her right hand behind her back, holding her down in this position until he could "attack" another woman who was trying to rescue Williams. *Id.* at 15–16, ¶¶ 39–40. Later, Williams learned that Anders was an off-duty police officer who was attempting to arrest Williams for allegedly evading arrest. *Id.* at 16, ¶ 41.

On April 9, 2021, Plaintiff Williams, proceeding through legal counsel, filed her initial *Complaint* against the City, the Overlook Apartments, and Anders, alleging all three defendants were liable under 42 U.S.C. § 1983 for violating her Fourth and Fourteenth Amendment rights. Doc. No. 1. On June 9, 2021, the City filed its initial *Motion to Dismiss* ("First Motion"), raising similar arguments to the present motion (Doc. No. 100). *See generally* Doc. No. 4. On June 21, 2021, Williams filed an *Unopposed Motion for Extension of Time to File a Response to the City's First Motion* (Doc. No. 6), which the court granted the same day. On July 20, 2021, Williams filed an *Amended Complaint* (Doc. No. 14), after which, the court denied the City's *First Motion* (Doc. No. 4) as moot. Doc. No. 17.

On July 28, 2021, the City filed its *Second Motion to Dismiss* ("Second Motion"), raising similar arguments to the present motion (Doc. No. 100). Doc. No. 18. On August 9, 2021, Williams filed an *Unopposed Motion for Extension of Time to File a Response to the City's Second Motion* (Doc. No. 21). The court granted William's motion for extension of time on August 10, 2021. Doc. No. 22. On August 18, 2021, Williams filed her *Second Amended Complaint* (Doc. No. 26). On September 8, 2021, Williams filed an *Agreed Motion Regarding Plaintiff's Third Amended Complaint* ("Motion to Withdraw") (Doc. No. 38), where the parties agreed to withdraw the City's *Second Motion* (Doc. No. 18) in anticipation of Williams's *Third Amended Complaint*.

3

On September 10, 2021, the court granted Williams's *Motion to Withdraw* (Doc. No. 38), effectively withdrawing the City's *Second Motion* from the docket.  Doc. No. 40.

On October 18, 2021, Williams filed her *Corrected Third Amended Complaint*.  Doc. No. 44.  On November 1, 2021, the City filed its *Third Motion to Dismiss* ("Third Motion"), raising the same arguments as its present motion (Doc. No. 100).  Doc. No. 47.  The parties fully briefed this motion.  *See* Pl.'s Resp., Doc. No. 52; Def.'s Reply, Doc. No. 57; Pl.'s Sur-Reply, Doc. No. 66.

On April 7, 2022, Williams's legal counsel filed an *Unopposed Motion to Withdraw* from representing Williams.  Doc. No. 80.  On May 18, 2022, the court held an *in camera* status conference before Judge Truncale regarding plaintiff counsel's *Unopposed Motion to Withdraw*. At that conference, the court determined Williams should have a period of 120 days to retain new counsel, and the City agreed to withdraw its *Third Motion* (Doc. No. 47).  On May 20, 2022, the court granted plaintiff counsel's *Unopposed Motion to Withdraw*, and denied the City's *Third Motion* as moot.  Doc. No. 91.  On October 25, 2022, Williams filed a *Notice to the Court Regarding Representation* (Doc. No. 99), stating that she will proceed with this litigation as a *pro se* litigant while she continues to search for new representation.  Doc. No. 99.

On October 26, 2022, the City filed its pending *Fourth Motion to Dismiss* ("Motion"). Doc. No. 100.  On November 18, 2022, Judge Truncale referred the pending motion (Doc. No. 100) to the undersigned for consideration and disposition.  Doc. No. 102.  On December 8, 2022, the undersigned ordered Williams to respond to the City's *Motion* (Doc. No. 100).  On December 20, 2022, Williams filed her *Reply and Brief to the City's Motion* ("Response").  Doc. No. 106. The undersigned will now consider the City's instant motion.

## II.  Legal Standard

### A.  Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  As a preliminary matter, it is well-established that federal pleading standards set forth by *Twombly* and *Iqbal* apply in municipal liability cases.  *Bond v. Nueces Cnty., Tex.*, No. 20-40050, 2022 WL 4595000, at *5 (5th Cir. Sept. 30, 2022) (citations omitted) ("[S]ince *Twombly* and *Iqbal*, this court has resumed applying the rule that a plaintiff must plead specific past instances to allege municipal liability."); *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 284 (5th Cir. 2020), *cert. denied*, 141 S.Ct. 376 (2020) (citations omitted) ("Indeed, our precedents make clear that the *Twombly* standard applies to municipal liability claims.").

To survive a Rule 12(b)(6) motion to dismiss under *Twombly* and *Iqbal*, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  The plaintiff's complaint "does not need detailed factual allegations," but her complaint "must raise a right to relief above the speculative level," providing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *Stringer v. Remington Arms Co., L.L.C.*, 52 F.4th 660, 661 (5th Cir. 2022) (citations omitted).

When assessing a motion to dismiss under this Rule, the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the

plaintiff.  *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012).  However, courts must "identify and disregard conclusory allegations because they are 'not entitled to the assumption of truth.'"  *Lamar Cnty. Elec. Coop. Ass'n v. McInnis Bros. Constr., Inc.*, No. 4:20-CV-930, 2021 WL 1061188, at *4 (E.D. Tex. Mar. 19, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (internal citation omitted).

Moreover, the court's review is limited "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that is central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted); *see also Jones v. Adm'rs of Tulane Educ. Fund*, 51 F.4th 101, 111 (5th Cir. 2022) (internal citation and quotation marks omitted) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

### III.    Discussion

In her *Corrected Third Amended Complaint* (Doc. No. 44), Williams alleges all three defendants are liable under 42 U.S.C. § 1983 for violating her Fourth Amendment right to be free from unreasonable searches and seizures, and her Fourteenth Amendment right guaranteeing equal protection of the law.  Doc. No. 44 at 18, ¶¶ 58-59.  Against the City alone, Williams alleges that the City's published "Police Department Directives Manual" establishes "policies, practices and customs permitting its police officers to conduct unreasonable seizures and other hostile actions based on race and ethnicity," which authorized Defendant Anders "to violate citizens' rights" protected by the United States Constitution and Texas law.  *Id.* at 4, ¶¶ 9, 11.  Specifically, Williams alleges that the City's policy "provides its police department ("NPD") with authority to

regulate and facilitate off-duty employment of its police officers," and allows employers to hire off-duty police officers to do police-related work, in exercise of their police powers, under the "unfettered final authority" of the City's Chief of Police. *Id.* at 4–5, ¶¶ 12–14, 18.

In its *Motion* (Doc. No. 100), the City moves to dismiss Williams's claims against it for failing to state a claim for municipal liability under the doctrine set forth in *Monell v. New York City Department of Social Services*. 436 U.S. 658 (1978); *see generally* Doc. No. 100. The City contends that: (1) Williams has not plausibly alleged a violation under the Equal Protection Clause, such that there is no underlying constitutional violation on this ground; (2) the City has no official policy permitting its officers to use excessive force, false arrest, or racially-motivated selective enforcement; and (3) Williams has not sufficiently pleaded a claim that the City has a pattern or practice of allowing for such discriminatory police tactics. The undersigned agrees with the City regarding all three arguments.

Title 42 U.S.C. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

It is well-established that municipalities are deemed to be "persons" susceptible to suit under Section 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) (internal footnote omitted) ("Local governing bodies, [] therefore, can be sued directly under § 1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). "To establish municipal liability under § 1983, a plaintiff must show that (1)

an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 558 (5th Cir. 2017) (internal citation and quotation marks omitted).

There are three ways to establish a "policy" under *Monell*:

First, a plaintiff can show written policy statements, ordinances, or regulations.[] Second, a plaintiff can show a widespread practice that is so common and well-settled as to constitute custom that fairly represents municipal policy.[] Third, even a single decision may constitute municipal policy . . . when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim.[]

*Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (internal footnotes, citations, and quotation marks omitted).

A.  <u>Underlying Constitutional Violations</u>

Importantly, "under § 1983, local governments are responsible only for their *own* illegal acts," and are emphatically *not* vicariously liable for their employees' actions, or liable under a theory of common law negligence. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original); *Daniels v. Williams*, 474 U.S. 327, 332 (1986) (rejecting application of the Fourteenth Amendment as "a font of tort law"); *Chuttoo v. Horton*, No. 4:20-cv-211-SDJ, 2022 WL 4100807, at *14 (E.D. Tex. Sept. 7, 2022) (internal citation and quotation marks omitted) ("But it is well established that a city is not liable under § 1983 on the theory of respondeat superior."). Nor do municipalities enjoy immunity under either the Eleventh Amendment or the doctrine of qualified immunity. *Leatherman v. Tarrant Cnty. Narcotics Intel. and Coordination Unit*, 507 U.S. 163, 166 (1993) (qualified immunity); *Monell*, 436 U.S. at 690 n. 54 (Eleventh Amendment).

Instead, there *must* be an underlying constitutional violation to impose liability on a municipality. *Baughman v. Hickman*, 935 F.3d 302, 311 (5th Cir. 2019); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012) (internal citations

omitted) ("We have stated time and again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'").

In its pending *Motion*, the City neither disputes nor concedes that Defendant Anders committed violations of William's Fourth Amendment rights to be free from excessive force and false arrest. *See generally* Doc. No. 100. Instead, the City only disputes that Williams has not plausibly alleged an underlying constitutional violation under the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 17–18. In her *Response*, Williams maintains that she has adequately alleged an underlying constitutional violation under the Fourth Amendment for Anders's use of excessive force against her. Doc. No. 106 at 4. Williams has not responded to the City's arguments relating the Equal Protection Clause. *See generally id.*

Because there is confusion as to whether the parties dispute Williams's underlying Fourth Amendment allegations, and because an underlying constitutional violation is "essential" to Williams's municipal liability claim, the court will discuss whether Williams's *Corrected Third Amended Complaint* (Doc. No. 44) plausibly states a claim for underlying constitutional violations under *both* the Fourth and Fourteenth Amendments. *Magee*, 675 F.3d at 867.

### i.    *Fourth Amendment Violations*

First, Williams complains that Defendant Anders violated her Fourth Amendment right to be free from unreasonable searches and seizures when he used excessive force to unlawfully arrest and detain Williams on the night of April 10, 2019. Doc. No. 44 at 18, ¶ 58. Williams has plausibly stated a claim on this ground.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. "The touchstone of the Fourth Amendment is thus reasonableness," which is measured "in objective terms by examining

the totality of the circumstances." *Peterson v. City of Forth Worth, Tex.*, 588 F.3d 838, 844 (5th Cir. 2009) (internal citations and quotation marks omitted).  Moreover, "[b]oth unlawful detention and excessive force implicate the Fourth Amendment's proscription against unreasonable seizures." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 16 n.16 (1968)).

### a.  Excessive Force

To establish a claim for excessive force, "a plaintiff must show that, in addition to being seized, [she] suffered '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Id.* (quoting *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006)); *see also Byrd v. Cornelius*, 52 F.4th 265 (5th Cir. 2022.  Here, there is no dispute that Williams suffered injuries at the hands of Defendant Anders.  *See generally* Doc. No. 44 at 11–16 (photographs of event and injuries).  The only question remaining is whether Anders's use of force "was excessive to the need and therefore objectively unreasonable." *Peterson*, 588 F.3d at 846.

"The test used to determine whether a force was reasonable under the Fourth Amendment 'is not capable of precise definition or mechanical application,'" and instead requires "'careful attention to the facts and circumstances of each case.'" *Byrd*, 52 F.4th at 270 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  At this juncture, the court must apply the factors set forth in *Graham v. Connor*, which includes: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [she] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396 (1989)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal citation and quotation marks omitted).

Here, when accepting Williams's factual allegations as true, she has plausibly stated an underlying constitutional violation for Anders's use of excessive force. *Iqbal*, 556 U.S. at 678. Williams alleges that she and her friends were traversing the Overlook Apartments' parking lot, when Defendant Anders yelled to "stay," but that "it was unclear what was being yelled at whom." Doc. No. 44 at 8, ¶ 21. It is unknown why Anders initially yelled at the group to "stay," however, and Williams states that Anders did not provide a justification to arrest her in the first instance.[1] *Id.* at 16, ¶ 42. The court will not presume facts not alleged regarding Anders's initial motivation to arrest Williams. Thus, Williams committed no underlying crime, or at best, a minimally severe crime for the purposes of the court's *Graham* analysis. *Graham*, 490 U.S. at 396. This factor therefore weighs in favor of Williams.

Next, the second *Graham* factor asks "whether the suspect poses an immediate threat to the safety of the officers or others." *Id.* When accepting Williams's allegations as true, a group of unarmed women walking away from a police officer in a parking lot, without more, cannot plausibly pose a threat to the officer's safety. *Graham*, 490 U.S. at 396; *compare Salazar-Limon v. City of Houston*, 826 F.3d 272, 278–79 (5th Cir. 2016) (holding that it was not unreasonable for officer to perceive an immediate threat to his safety when suspect walked away from the officer and *reached for his waistband* because the officer perceived the suspect's "movements to be consistent with those of an arrestee reaching for a concealed weapon," and the suspect showed signs of intoxication, resistance, and disregard for officer's orders) *with Castillanos v. Faiura*, No. H-22-1442, 2022 WL 6766160, at *7 (S.D. Tex. Oct. 11, 2022) (holding objectively reasonable

---

[1] Ultimately, the parties' briefing fails to provide, or allege, a rationale regarding why Defendant Anders yelled or "ordered" the group of friends to "stay" in the first instance. Neither Williams's *Corrected Third Amended Complaint* (Doc. No. 44), the City's pending *Motion* (Doc. No. 100), nor Williams's *Response* (Doc. No. 106) have provided any ground or explanation regarding the underlying illegal activities Williams and her friends allegedly committed in the Overlook Apartments parking lot.

basis to believe suspect posed a threat to officers' safety when suspect refused orders to abandon gun, "walked away from the officers, fired his gun into the ground, then turned to face the officers and raised his gun using both hands and pointed the gun toward one of the officers.") *and Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018) ("[S]ince Samples was 'clearly unarmed' and not 'combative,' nothing suggests that Samples 'pose[d] an immediate threat to the safety of the officers or others.'").

Here, the totality of the circumstances, as pleaded, do not rise to the level of threat posed in either *Salazar-Limon* nor *Castillanos*.  When looking from the perspective of an officer at the Overlook Apartments parking lot that night, there is no indication that either Williams, nor any of her friends or persons associated with her, possessed any type of weapon as they walked away from Defendant Anders.  *Byrd*, 52 F.4th at 270.  Nor is there any indication that they showed other signs of resistance to Anders, except their confusion when he yelled at them to "stay," and they failed to discern he was giving them an order.  As such, the totality of the circumstances cannot plausibly suggest that Officer Anders perceived an immediate threat to his safety that evening, in any capacity.  *Id.*  This factor therefore weighs in favor of Williams's allegation of excessive force.

Lastly, Defendant Anders "later documented that he was . . . attempting to *arrest* Williams for allegedly evading arrest," which would usually satisfy the third *Graham* factor.  Doc. No. 44 at 16, ¶ 41 (emphasis in original).  The court notes Williams's *Corrected Third Amended Complaint* is devoid of any attachments that "documented" this rationale, however nonetheless accepts it as true for the purposes of the instant motion to dismiss.  *Iqbal*, 556 U.S. at 678.  Williams could not have actively resisted arrest or attempted to evade arrest by flight if, as she alleges, it was unclear that Defendant Anders had ordered her under arrest in the first instance.  *See Samples*, 900 F.3d at 662 ("[A]ssuming that Sample was indeed 'not attempting to flee'— and, indeed, that

he had never been formally commanded to stop—it cannot be sustained that he was 'actively resisting arrest or attempting to evade arrest by flight' such that a taser was necessary."). Moreover, even if Williams had understood Defendant Anders's initial command, and walked back to her car in resistance, this could plausibly constitute a form of passive resistance, and Anders's use of force would still not be justified. *See Peña v. City of Rio Grande City, Tex.*, 816 F. App'x 966, 972 (5th Cir. 2020) ("According to Peña, her only physical resistance prior to being tased was her refusal to give Vela her hands and get out of the car. Such minimal resistance does not warrant the degree of force used."). This factor too weighs in favor of Williams's allegation for excessive force.

Accordingly, the amount of force Defendant Anders used against Williams was "excessive to the need," given that Williams was unarmed and not explicitly rejecting Anders's command in light of the alleged confusion that he was an officer, and the friends could not discern he was giving orders. *Peterson*, 588 F.3d at 846. Moreover, when analyzing the totality of the circumstances that evening, from the perspective of Defendant Anders, and without understanding what illegal activities with which Williams and her friends engaged, the amount of force used was objectively unreasonable. *Id.* As such, Williams has plausibly stated a claim for excessive force such that she has alleged an underlying Fourth Amendment constitutional violation for her *Monell* liability claim against the City.

### b.  False Arrest

While not explicitly alleged in her *Corrected Third Amended Complaint* (Doc. No. 44), the City has inferred that Williams also alleges a Fourth Amendment violation for false arrest, and disputes that Williams has not plausibly alleged a constitutional violation for this claim. *See Fourth Mot. to Dismiss*, Doc. No. 100 at 1 ("This false arrest-excessive force case arises under 42

U.S.C. § 1983 . . ."); *Id.* at 6 ("Williams has failed to state a plausible underlying claim of . . . false arrest by Defendant Anders."). The court reads Williams's third amended complaint as alleging a false arrest claim as well. *Third Am. Compl.*, Doc. No. 44 at 16, ¶¶ 41, 46 (alleging that "[t]here was no reason for Anders to peacefully arrest Williams," and that this "also constituted an unreasonable seizure in violation of the Fourth Amendment.").

To prevail on a Fourth Amendment claim for false arrest, a plaintiff "must sufficiently allege (1) that [she] was arrested, and (2) the arrest did not have the requisite probable cause." *Rhodes v. Prince*, 360 F. App'x 555, 558 (5th Cir. 2010); *see also Bey v. Prator*, 53 F.4th 854, 857–58 (5th Cir. 2022) (quoting *Club Retro, L.L.C. v. Hilton*, 569 F.3d 181, 208 (5th Cir. 2009)) ("'A search and seizure of a person must be based on probable cause particularized with respect to that person unless a constitutionally adequate substitute for probable cause exists.'"); *Club Retro*, 568 F.3d at 204 (internal footnote and citation omitted) ("The constitutional claim of false arrest requires a showing of no probable cause."). Probable cause is composed of the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Club Retro*, 568 F.3d at 204 (quoting *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000)). "The facts must be known to the officer at the time of the arrest," cannot be "post-hoc justifications based on facts later learned," and must be "particularized" to the arrestee. *Id.* (citing *Sibron v. New York*, 392 U.S. 40, 62–63 (1968) and *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

Here, neither party has proposed an underlying rationale or justification for Anders's *initial* arrest of Williams. Indeed, in her third amended complaint, Williams states that "Mr. Anders later documented that he was . . . attempting to *arrest* Williams for allegedly evading arrest." Doc. No.

44 at 16, ¶ 41. This explains the events giving rise to Williams's excessive force claim above —
that Defendant Anders "yanked her around," placed her in a headlock, and "pushed her down on
the pavement" because Williams allegedly evaded Anders's *initial* arrest. *Id.* at 11–15, ¶¶ 35–39.
This does not, however, provide any justification, let alone basis for probable cause, regarding
why Defendant Anders initially attempted to arrest Williams — neither party has apprised the
court with an underlying explanation. Indeed, Williams alleges there "was no reason for Anders
to peacefully arrest Williams" in the first place. Doc. No. 44 at 16, ¶ 41. The City has not provided
an alternative explanation for Anders's arrest. As such, the court has no alternative but to find that
Williams has adequately pleaded both elements: (1) the City does not dispute Anders arrested
Williams, and the court agrees as such, and (2) the City has not discussed the existence of probable
cause, let alone any kind of justification, and Williams alleges there was none. *Rhodes*, 360 F.
App'x at 558.

        To the extent that the City believes Williams's underlying false arrest claim fails because
Defendant Anders had probable cause to believe she was evading arrest, this too is incorrect. In
Texas, a person evades arrest "'if [she] intentionally flees from a person [she] knows is a peace
officer . . . attempting lawfully to arrest or detain [her].'" *Zimmerman v. Cutler*, 657 F. App'x
340, 344 (5th Cir. 2016) (quoting TEX. PENAL CODE § 38.04(a)). "A person cannot be convicted
of evading detention unless an officer had reasonable suspicion or probable cause to detain the
suspect" for an initial crime in the first instance. *Id.* (citing *Jenkins v. State*, 454 S.W.3d 712, 714–
15 (Tex. App.—Corpus Christi 2015, no pet.)). Thus, for the same reasons stated above — that
the court lacks knowledge of the underlying basis motivating Defendant Anders's initial intention
to arrest Williams — this too lacks either reasonable suspicion or probable cause. *Id.*; *Flores v.
City of Palacios*, 381 F.3d 391, 402–03 (5th Cir. 2004) (quoting *Goodson v. City of Corpus Christi*,

202 F.3d 730,740 (5th Cir. 2000)) (alterations in original) ("A suspect's flight from a police officer generates probable cause to arrest the suspect under section 38.04 only if the officer 'could have reasonably believed that [his] detention of [the suspect] was lawful.'"); *Ponder v. City of Commerce, Tex.*, No. 3:19-CV-1205-C, 2020 WL 868502, at *4 (N.D. Tex. Feb. 12, 2020) (no probable cause for an officer to arrest suspect for crime of evading detention without "repeated orders of detention" and a reasonable belief "that the detention was lawful").

Additionally, Williams alleges that Anders was "wearing loud shorts and a t-shirt," such that he was off-duty, dressed in civilian clothing.  Doc. No. 44 at 7, ¶ 30 (stating Anders was yelling and "having some sort of tantrum").  Williams has therefore also plausibly alleged she did not know Anders was a peace officer attempting to arrest or detain her, even when he exited from a police vehicle, and that Anders did not identify himself as police officer until after the events occurred.  *Id.* at 10, 16 ¶¶ 34, 41 (emphasis added) ("Anders *later* documented that he was an off-duty police officer . . ."); *compare with Ponder*, 2020 WL 868502, at *4 (off-duty police officer arrested suspect in Wal-Mart parking lot, however suspect knew man was police officer because he "show[ed] his credentials and identified himself to be a police officer").

As such, Williams has plausibly stated a claim for false arrest, giving rise to an underlying constitutional violation for her *Monell* liability claim against the City.

### ii.    Fourteenth Amendment Violations

Lastly, Williams alleges an underlying constitutional violation of her right to equal protection of the laws, as guaranteed by the Fourteenth Amendment's Equal Protection Clause. Doc. No. 44 at 18, ¶ 59; U.S. Const. Amend. XIV, § 1.  Specifically, Williams alleges that "Anders'[s] attack was racially motivated," which therefore constitutes an equal protection violation.  In its *Motion* (Doc. No. 100), the City disagrees, and states that Williams's pleading is

a legal conclusion that does not pass muster under *Twombly* and *Iqbal*.  Doc. No. 100 at 17–18.  Moreover, the City contends that "Williams does not offer a single fact to support the conclusion that Anders'[s] attempted arrest of her, or the force he used to carry it out, was tainted by race-based motivations." *Id.* at 18.  Here, the undersigned agrees with the City.

"The Equal Protection Clause directs that persons similarly situated should be treated alike."  *Anokwuru v. City of Houston*, 990 F.3d 956, 965 (5th Cir. 2021) (internal citation and quotation marks omitted).  To state a claim for racial discrimination under section 1983 and the Equal Protection Clause, a plaintiff must plausibly allege: (1) "that he was treated differently than persons similarly situated to [her];" and (2) "that such treatment stemmed from discriminatory intent." *Id.* (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2012)).  "To establish discriminatory intent, a plaintiff must show that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Id.* (internal citation and quotation marks omitted).

Here, Williams failed to allege that she was treated differently from persons similarly situated to her. *Anokwuru*, 990 F.3d at 965.  Indeed, Williams alleges that she and her friends "and most of the other people in the same area, happened to be black[,] African Americans who had been at the campus swimming gathering."  Doc. No. 44 at 7, ¶ 29.  Therefore, Williams has provided no similarly situated comparator to show that Anders "singled out" Williams for her race. *Anokwuru*, 990 F.3d at 965.

Moreover, other than the conclusory allegation that "Anders'[s] attack was racially motivated," Williams has also failed to allege facts supporting the assertion that Anders harbored discriminatory intent. *Id.*  Williams's conclusory allegations that Anders's actions were "racially

motivated" decidedly cannot suffice. *Lamar Cnty. Elec. Coop. Ass'n.*, 2021 WL 1061188, at *4 (quoting *Iqbal*, 556 U.S. at 664) (courts must "identify and disregard conclusory allegations because they are 'not entitled to the assumption of truth.'"); *Iqbal*, 556 U.S. at 678 (internal citation omitted) ( "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, Williams's *Response* (Doc. No. 106) states that "[a]s former Nacogdoches police Officer Josh Anders had no probable cause, the option had to be racial profiling." Doc. No. 106 at 5. Not only is this allegation not pleaded in her third amended complaint such that the undersigned must disregard it, but even if this were pleaded in her operative complaint, it would still not sufficiently allege facts to give rise of discriminatory intent — it is yet another conclusory allegation. *Lone Star Fund*, 594 F.3d at 387 (citation omitted) (the court's review is limited "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that is central to the claim and referenced by the complaint.").

Accordingly, Williams has not plausibly stated a claim that Anders violated her rights under the Equal Protection Clause. This therefore cannot serve as an underlying constitutional violation to proceed with her *Monell* liability claim against the City. However, as Williams has adequately pleaded the existence of underlying constitutional violations under the Fourth Amendment, *see supra*, the court will proceed with discussing Williams's allegations against the City for an alleged policy or practice of discrimination.

### B. Official Policy

To proceed with her *Monell* liability claim, Williams is "required to plead facts that plausibly establish: 'a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom.'" *Ratliff* , 948 F.3d at 285 (quoting *Piotrowski v.*

*City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).  There are three ways to establish a "policy" under *Monell*:

> First, a plaintiff can show written policy statements, ordinances, or regulations.[] Second, a plaintiff can show a widespread practice that is so common and well-settled as to constitute custom that fairly represents municipal policy.[] Third, even a single decision may constitute municipal policy . . . when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim.[]

*Webb*, 925 F.3d at 215 (footnotes and citations omitted).

For example, in *Monell*, the New York City Department of Social Services and Board of Education had an official policy to compel pregnant employees to take unpaid maternity leave after their fifth month of pregnancy.  *Monell*, 436 U.S. at 661; *Id.* n.2.  This "official policy" requirement was intended "to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *McWilliams v. City of Houston*, No. 21-20369, 2022 WL 17337820, at *5 (5th Cir. Nov. 30, 2022) (internal citation and quotation marks omitted) (emphases in original).

Here, the City contends that (1) Williams's allegations regarding the City's police departmental policies are conclusory; and (2) there is no written, official policy that allows for unreasonable searches and seizures based on race and ethnicity.  Doc. No. 100 at 8–9.  Indeed, the City attached as Exhibit 1 relevant portions of the Nacogdoches Police Department Directives Manual, which "expressly prohibits racial profiling;[] the use of constitutionally excessive force;[] [and] warrantless arrests without probable cause.[]"  *Id.* at 8 (footnotes omitted); *see also* Ex. 1, Doc. No. 100-1 ("Police Department Directives Manual") [hereinafter "Manual"].

In her *Corrected Third Amended Complaint*, Williams alleges that the City publishes this Manual, and "had a duty to create and enforce policies and practices to assure that its police officers

respect and do not violate citizens' federal constitutional rights." Doc. No. 44 at 4, ¶ 9. Moreover, Williams alleges that "[c]ontrary to these obligations, at times pertinent to this case[,] the City had established policies, practices and customs permitting its police officers to conduct unreasonable seizures and other hostile actions based on race and ethnicity, creating an environment in which Defendant Anders felt authorized" to violate Williams's constitutional rights. *Id.*, ¶ 11.[2]

Thus, Williams merely states that the City has policies to permit its officers to conduct unreasonable searches and seizures, but fails to *identify* with any type of specificity, a policy or provision that would support this assertion. *Murray v. Town of Mansura*, 76 F. App'x 547, 549 (5th Cir. 2003) (citation omitted) ("Murray's claim against Lucas fails for the same reason that his claim against the Town cannot succeed: Murray has not identified a policy or custom that caused him a constitutional deprivation."); *Colle v. Brazon Cnty., Tex.*, 981 F.2d 237, 245 (5th Cir. 1993) (internal footnotes and citations omitted) ("A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity.[] For example, even though an arresting police officer uses excessive force, it does not necessarily follow that the city adopted a policy endorsing such acts.[]"). Instead, these are the exact type of "threadbare recitals" and conclusory

---

[2] Once more, in her *Response* (Doc. No. 106), Williams points to two different provisions of the Police Manual that she avers states an official policy of unconstitutional policing. Doc. No. 106 at 5. The provisions to which Williams cites explicitly prohibit racial profiling.

For example, Williams points to Section III of the NPD Manual, which requires the Police Department to "collect information related to traffic stops in which a citation or warning is issued," and to collect "[t]he race or ethnicity of the person detained as stated by the person or as determined by the standard of any reasonable police officer." Ex. 1, Doc. No. 100-1 at 11, Directive 2.01.1, § III.A.1. Williams also cites to Directive 2.01.1, § III.E., which states "[o]fficers are prohibited from stopping, detaining, searching or arresting anyone on the sole basis of racial or ethnic profiling." *Id.* at § III.E.

Both provisions, however, support the City's assertion that the NPD does not have an official policy to allow its officers to engage in racial profiling or conduct unreasonable searches and seizures based on race. Indeed, Section III of the Manual merely states the NPD must *collect* information related to *traffic stops*, and note the race or ethnicity of persons arrested. This is to comply with the Texas Code of Criminal Procedure Article 2.132 and 2.133, and the Manual's own "Policy" which is "that bias-motivated profiling based on race, ethnic background, gender . . . or any other identifiable group is an unacceptable practice that is not tolerated." Williams's arguments in her *Response* are therefore unpersuasive, and in fact, only serve to bolster the City's arguments.

allegations that do not pass muster under Rule 12(b)(6).  *Iqbal*, 556 U.S. at 678; *Bond*, 2022 WL 4595000, at *9 ("*Twombly* and *Iqbal* require us to . . . remov[e] from our consideration of Bond's proposed third amended complaint any bare statements that jail officials acted in accordance with a policy maintained by Nueces County when they allegedly violated Tami's constitutional rights.").

Moreover, to the extent that Williams complains that NPD's Manual does not afford private citizens *enough* protection, this too cannot suffice to state a *Monell* claim.  *See McWilliams*, 2022 WL 17337820, at *6 ("Plaintiffs cannot maintain a *Monell* claim merely based on a conclusory allegation that the policy did not regulate enough.").  Accordingly, Williams's complaint fails to establish the City set forth an "official policy" of permitting its officers to conduct unreasonable searches and seizures based on race and ethnicity.  The court will proceed to the next possibility: whether Williams established the City has, in effect, a widespread pattern or practice of allowing for such police misconduct.

C.  Customary Policy

Regarding the customary policy alternative, the City maintains that Williams has failed to allege that NPD has a widespread pattern or practice of allowing its officers to engage in unreasonable searches and seizures based on race.  Doc. No. 100 at 9.  Here, the undersigned agrees.

In her third amended complaint (Doc. No. 44), Williams failed to plead the existence of a customary policy of allowing the City's police officers to engage in such racially discriminatory, unconstitutional conduct.  Instead, Williams alleges the following paragraphs that closely resemble an allegation for a customary policy of discrimination:

24. The Defendant City and NPD have a history of tolerating race discrimination by their police officers and police department.  It is Plaintiff's information and

belief that the City's complicity in race discrimination is a cause of Anders'[s] attack on Williams.

25. For instance, the City annually reports racial profiling statistics that consistently reflect substantial and/or significant disparities showing that its police officers' discretionary searches are disproportionately visited on non-white (and black) citizens than on white citizens. The City is aware of these disparities and does nothing meaningful to determine and correct their causes or to provide any explanation for the disparities other than racial discrimination.

26. Also, while the City typically hires only one, or a few, black[,] African-American police officers, it is well below the proportion of black officers that would be expected based on the racial composition of the City's population. The City is aware of this and similarly takes no meaningful effort to determine or correct the apparent discriminatory effects of its practices.

27. The NPD is generally known to have problems getting along with black[,] African American citizens of Nacogdoches, and similarly does nothing meaningful to determine or correct the apparent discriminatory effects.

Doc. No. 44 at 6–7.

None of these allegations, however, plausibly state a claim that the City maintains a customary policy of race discrimination in police enforcement. "To plausibly plead a practice 'so persistent and widespread as to practically have the force of law,' a plaintiff must do more than describe the incident that gave rise to [her] injury" — she must plead the existence of "actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021), *cert. denied*, 211 L.Ed. 2d 569, 142 S. Ct. 863 (2022) (internal citations omitted). A pattern or practice of unconstitutional violations "is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson*, 588 F.3d at 850 (internal citation omitted).

In *Ratliff*, the plaintiff's complaint stated that "the assault, beating, and severe injury to citizens, with little or no justification, is a persistent, widespread practice of County employees—

namely officers/deputies—that . . . is so common and well settled as to constitute a custom that fairly represents official county policy."  *Ratliff*, 948 F.3d at 285 (internal quotation marks omitted).  There, the Fifth Circuit held that "this allegation does not contain any specific facts" and only detailed the events giving rise to the action.  *Id.*  Therefore, the Court held Ratliff could not satisfy *Twombly* and *Iqbal* in pleading a customary policy of police brutality.  *Id.*

The same principle controls in the present case.  Indeed, there is "no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts," however the Fifth Circuit has held that examples of "isolated violations" cannot constitute a "custom and policy."  *Jackson*, 852 F. App'x at 135–36 (holding that "allegations of two incidents of strip searches and four incidents of sex-based classifications of two transgender people in a span of five years" did not plausibly allege a customary practice of strip searches and transgender classifications of detainees); *Chuttoo*, 2022 WL 4100807, at *15 ("Nor does Chuttoo point to any specific, prior instances of Frisco police officers using excessive force or committing wrongful arrests that would indicate widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.").

For this reason, the Fifth Circuit has required "sufficiently numerous prior incidents" to establish a pattern of unconstitutional conduct constituting customary policy.  *Peterson*, 588 F.3d at 851 (internal citation and quotation marks omitted); *Id.* at 850–51 (quoting *Piotrowski*, 237 F.3d at 582) ("It is thus clear that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case.'").  Thus, a "pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.'"  *Id.* at 851–52 (holding that a pattern of 27 complaints of excessive force between 2002 and 2005 did not create a pattern of unconstitutional conduct because "the

plaintiffs have failed to provide context that would show a pattern of establishing a municipal policy," such as the size of the police department "or how many arrests were made by the department between 2002 and 2005."); *see also LaForge v. Angelina Cnty., Tex.*, No. 9:20-CV-72, 2020 WL 5580888, at *4 (E.D. Tex. Aug. 31, 2020), *R. & R. adopted*, No. 9:20-CV-72-RC-ZJH, 2020 WL 5570349 (E.D. Tex. Sept. 16, 2020) (citation omitted) ("She has not identified a single instance of another citizen who was subjected to a similar constitutional violation—i.e., another public employee of the County who was fired in retaliation for engaging in protected speech—which is fatal to a widespread practice claim.").

Additionally, the Fifth Circuit has held that "a plaintiff's 'subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief.'" *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983) (citation omitted). Moreover, to prove the occurrence of discrimination, "parties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is similarly situated." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 360 (5th Cir. 2015) (equal protection context). Even with such satisfactory statistical evidence, the plaintiff must proffer evidence of a *pattern* of abuses. *See, e.g.*, *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 536–37 (W.D. Tex. 2017) (emphasis added) ("The statistics Plaintiffs allege *in addition to the detailed description of no less than nine* mentally ill individuals who have been either killed or wounded by EPPD officers since 2013 support a reasonable and plausible inference of a pattern or practice of excessive force."); *see also Ramirez v. Escajeda*, 298 F. Supp. 3d 933, 943 (W.D. Tex. 2018) (footnote omitted) ("Plaintiffs offered detailed accounts of eight other instances of the alleged use of excessive force against mentally ill

persons from 2013 to 2016 and various statistics indicating the use of force against the mentally ill is an issue for the City of El Paso.[]").

Here, Williams's operative complaint is devoid of any prior instances of NPD's use of racially discriminatory excessive force or false arrest on any other citizen. This is fatal to the possibility of inferring the existence of a customary policy allegation. *Ratliff*, 948 F.3d at 285; *Chuttoo*, 2022 WL 4100807, at *15. Williams's pleading is therefore deficient in the exact same manner as the plaintiffs in *Ratliff*, *Chuttoo*, and *LaForge* — Williams has not provided *any* prior instances of citizens subjected to the same unconstitutional conduct by NPD police, and thus has not alleged a pattern beyond the facts giving rise to the instant complaint. *Ratliff*, 948 F.3d at 285; *Chuttoo*, 2022 WL 4100807, at *15; *LaForge*, 2020 WL 5580888, at *4, *R. & R. adopted*, 2020 WL 5570349 (E.D. Tex. Sept. 16, 2020).

Moreover, Williams's allegations that the City and NPD have a "history of tolerating race discrimination by their police officers and police department" do not adequately allege the existence of a pattern or practice, for this nebulous allegation lacks the "sufficiently numerous prior incidents" with similarity and specificity to establish a pattern of unconstitutional conduct constituting customary policy. *Peterson*, 588 F.3d at 851–52. Nor can Williams sustain a claim based on her "information and belief that the City's complicity in race discrimination is a cause of Anders'[s] attack on Williams," as a belief cannot be the basis for judicial relief. *Elliott*, 714 F.2d at 567. Williams's allegations that the City's racial profiling statistics "consistently reflect substantial and/or significant disparities" in officers' discretionary searches between white and non-white citizens must similarly fail — Williams has provided no supplementary pattern of incidents, and the court is not apprised of whether the "discretionary searches" amount to constitutional violations in the same manner and context as Williams incurred. *Peterson*, 588 F.3d

at 851–52; *Ramirez*, 298 F. Supp. 3d at 943; *Sanchez*, 283 F. Supp. 3d at 536–37.  Lastly, Williams's complaints regarding NPD's alleged lack of diversity in its hiring of police officers is of no import to the present analysis contemplating the unconstitutional use of excessive force and false arrest against its citizens.  Doc. No. 44 at 6–7, ¶¶ 25–26.

Accordingly, Williams has not plausibly alleged the existence of a widespread pattern or practice of NPD permitting its police officers to engage in unconstitutional searches and seizures of its citizens to amount to a customary policy.  The undersigned will therefore move on to the last possible form to plead an official policy of whether unconstitutional conduct exists: when a single decision constitutes municipal policy.  *Webb*, 925 F.3d at 215.

D.  Single Decision

"A single decision may constitute municipal policy . . . when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim."  *Webb*, 925 F.3d at 215.  "Although a policymaker's single decision may be in effect a policy that creates liability for a municipality, the situations to which this exception applies are few and will create 'municipal liability only if the municipal actor is a final policymaker.'"  *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (quoting *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010)).

Here, the single decision complained of is the events that occurred on April 10, 2019, namely, Defendant Anders's arrest and detention of Williams.  This decision cannot plausibly amount to official municipal policy, however, as neither party suggests that Anders was an "official . . . possessing final policymaking authority" for this act.  Indeed, Williams alleges, and the City does not dispute, that the Nacogdoches Chief of Police has "unfettered final authority" regarding the off-duty police-related employment of its officers.  Doc. No. 44 at 5, ¶ 18.  As such,

Defendant Anders cannot plausibly be the final policymaker in this case, such that his actions against Williams constituted official municipal policy for the City.  Accordingly, Williams has not plausibly alleged the existence of an official policy on this ground either.

Lastly, the undersigned addresses Williams's allegations that Anders's "actions were within his scope of his employment by both Defendants Outlook Apartments and the City of Nacogdoches."  Doc. No. 44 at 17, ¶ 51.  The court cannot entertain this claim as it is well-established there is no vicarious liability or respondeat superior theories of *Monell* liability for the actions of a city's employees.  *Monell*, 436 U.S. at 692 ("At the same time, that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of an employer-employee relationship with a tortfeasor."); *Connick*, 536 U.S. at 60 (internal citations omitted) (emphasis in original) ("[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts,' . . . [and] are not vicariously liable under § 1983 for their employees' actions.").

In sum, Plaintiff Williams has plausibly alleged underlying constitutional violations for her Fourth Amendment rights to be free from excessive force and false arrest.  She has not, however, adequately alleged the existence of an equal protection violation under the Fourteenth Amendment.  Moreover, Williams has failed to sufficiently plead the existence of an official policy to satisfy the first element of *Monell* liability: she has neither shown the City has an "official" policy of permitting its officers to engage in racially discriminatory unconstitutional conduct; nor has she adequately alleged the City maintains a widespread pattern or practice of this conduct such that it would amount to customary policy; and Williams cannot plausibly show that Anders was the final policymaker in his actions taken against Williams such that his actions amount to official municipal policy.  Nor can Williams plausibly plead *Monell* liability through a theory of respondeat superior.  Accordingly, without the existence of an "official policy," Williams's

theories of municipal liability must fail.  The undersigned need not waste time analyzing the second and third elements under *Monell*.  *Balle*, 952 F.3d at 558.

Finally, the court agrees with the City that Williams has set forth her "best case."  Doc. No. 100 at 3–4.  Generally, "a *pro se* litigant should be offered an opportunity to amend [her] complaint before it is dismissed."  *Brewster v. Dretke*, 587 F.3d 764, 767 (5th Cir. 2009) (citation omitted).  "Granting leave to amend is not required, however, if the plaintiff has already pleaded [her] 'best case,'" and where the plaintiff fails to state material facts she would include in an amended complaint.  *Id.* (citation omitted).  A plaintiff pleads her best case "after she is 'apprised of the insufficiency' of her complaint."  *Wiggins v. La. State Univ.-Health Care Servs. Div.*, 710 F. App'x 625, 627 (5th Cir. 2017) (internal citation omitted).  The City has filed three previous motions to dismiss, informing Williams of the deficiencies in all three of her previous complaints, which therefore resulted in her filing an amended complaint in response each time.  Doc. Nos. 4 (First Motion to Dismiss), 14 (Amended Complaint), 18 (Second Motion to Dismiss), 26 (Second Amended Complaint), 42 (Third Motion to Dismiss), 44 (Third Amended Complaint).  Moreover, Williams's *Response* (Doc. No. 106) fails to state proposed material facts in an amended complaint.  *Brewster*, 587 F.3d at 767.  Accordingly, Williams has pleaded her "best case" and the court should not afford her further leave to amend.

Therefore, the undersigned recommends granting the City's *Fourth Motion to Dismiss* with prejudice.  Doc. No. 100.

### IV.   Recommendation

For the reasons stated above, the undersigned recommends granting with prejudice the City of Nacogdoches's *Fourth Motion to Dismiss Under Rule 12(b)(6)*.  Doc. No. 100.

### V.   Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C), each party to this action has the right to file objections to this Report and Recommendation.  Objections to this Report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this Report, and (4) be no more than eight (8) pages in length.  *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2); E.D. TEX. CIV. R. CV-72(c). A party who objects to this Report is entitled to a *de novo* determination by the United States District Judge of those proposed findings and recommendations to which a specific objection is timely made. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this Report, within fourteen (14) days of being served with a copy of this Report, bars that party from: (1) entitlement to *de novo* review by the United States District Judge of the findings of fact and conclusions of law, and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States District Judge.  *See Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 21st day of December, 2022.

Zack Hawthorn
United States Magistrate Judge